```
 1                UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF ARIZONA

 3                   _____

 4
     Barbara Jean Rose,          )
 5                                )   No. CV 2012-1271-PHX-MHB
               Plaintiff,         )
 6                                )
          vs.                     )   Phoenix, Arizona
 7                                )   September 12, 2012
     ADESA Phoenix, LLC,          )   9:33 a.m.
 8                                )
               Defendant.         )
 9   _____)

10
       BEFORE:  THE HONORABLE MICHELLE H. BURNS, MAGISTRATE JUDGE
11

12            REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                  (Scheduling Conference)

14   APPEARANCES:
     For the Plaintiff:
15         PRO SE
           By: Barbara Jean Rose
16         P.O. Box 26791
           Phoenix, AZ 85068
17
     For the Defendant:
18         SNELL & WILMER LLP
           By: Kelly W. MacHenry, Esq.
19         By: Amanda Sheridan, Esq.
           400 E. Van Buren
20         Phoenix, AZ 85004

21   Transcriptionist:
     Laurie A. Adams
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, SPC-43
23   Phoenix, Arizona 85003-2151
     (602) 322-7256
24
     Proceedings Recorded by Electronic Sound Recording
25   Transcript Produced by Transcriptionist
```

September 12, 2012 - Scheduling Conference

1           P R O C E E D I N G S
2           THE COURT: Good morning. You may be seated.
3           This is the time set for a scheduling conference.
4           THE MAGISTRATE CLERK: Civil Case Number 12-1271, Rose
5    versus ADESA Phoenix, LLC, et al., on for Rule 16 scheduling
6    conference.
7           Will the parties please announce their appearance for
8    the record.
9           THE COURT: For the plaintiff, who is here for the
10   plaintiff?
11          MS. ROSE: Barbara Jean Rose.
12          THE COURT: Good morning, Ms. Rose. You may be
13   seated.
14          MS. MacHENRY: Good morning, Your Honor. Kelly
15   MacHenry and my colleague Amanda Sheridan from Snell & Wilmer
16   for ADESA, LLC.
17          THE COURT: Good morning. This is the time set for
18   the Rule 16 conference. And what I intend to accomplish here
19   is to get a little bit of an idea of what the case involves.
20   And the reason for that is because it's my job today to figure
21   out what our schedule should be, how long I should give the
22   parties to do certain things and then to prepare for trial and
23   how long the parties will need to get all of the discovery done
24   and other deadlines like that.
25          And I did read your joint proposed case management

1  report, and I do have some idea of what the case is about.  But
2  perhaps it would be helpful, and I do find it helpful in these
3  conferences, to get a little bit more flavor, if you will, of
4  what the parties need to do to get this case investigated and
5  prepared for trial and possibly settlement.
6         So why don't I, recognizing, Ms. Rose, that you are
7  pro se, I will ask the defendants to go first so you can get an
8  idea of, if you haven't been through litigation before, you can
9  get an idea what needs to be said.
10         So you may proceed.  And it's Ms. MacHenry, right?
11         MS. MacHENRY:  Yes.  Good morning, Your Honor.
12         This is a trip and fall incident.  It happened at
13 ADESA Auto Auction in Chandler back in April, 2010.  Plaintiff
14 Ms. Rose was acting as a dealer representative who was there to
15 bid on some cars that were up for sale that day.  According to
16 our information, she had been there at that particular location
17 and had done so for many, many years.  And the records that we
18 have reviewed show that, in fact, she had been there, to that
19 location, at least 60 times in the past three years before this
20 particular incident.
21         What is unverified at this point is exactly what she
22 tripped on on April 7, 2010.  And accounts of the incident have
23 varied a little bit, so we're still working to get to the
24 bottom of what precisely she tripped on and whether ADESA had
25 anything to do with that.

1       THE COURT:  That is one of the questions I had for you
2  because I noted in the report that it was indicated that the
3  investigation is ongoing.  This happened in 2010.  Was there
4  some delay in the investigation, or is it just that there are
5  so many people that still need to be contacted?  What is
6  exactly the nature of what needs to be done?
7       MS. MacHENRY:  More along the lines of the latter,
8  Your Honor.  There was an investigation at the time.  It was a
9  little bit unclear, even at the time, what precisely was the
10 mechanism of injury or of trip.  We have interviewed some folks
11 since then.  We have heard a number of different ideas floated
12 and I still -- we still need to talk directly with Ms. Rose a
13 little bit about what more of what her memory is about what
14 happened and then explore who exactly may have been responsible
15 for whatever the object was, try to identify that a little bit
16 more directly.
17      ADESA has investigated.  As I said, we have talked to
18 people who were there that day.  None of them remember anything
19 out of the ordinary this particular day, April 7.  And we --
20 ADESA has viewed the site extensively.  We haven't discovered
21 anything that was in an unreasonably dangerous condition on the
22 date of this incident.
23      And I -- let me respond to this because in the case
24 management report there is a statement in the plaintiff's
25 section of the statement of the case about a buffet table, and

1  that was something relatively new in terms of information so,
2  again, we have begun exploring that more recently.
3          As far as that buffet table in that statement --
4          THE COURT:  The buffet table is not mentioned in the
5  complaint?
6          MS. MacHENRY:  I don't believe so.
7          THE COURT:  All right.
8          MS. MacHENRY:  As far as the buffet table, we have
9  begun investigating that.  The table that we believe is in
10 issue is an ordinary card table.  It is there for food to be
11 placed on top of it at every such auction like the one that was
12 happening on the day of this incident.  There's nothing odd or
13 unusual about it now or is anything known to be odd or
14 unreasonable on the day of the incident.
15         In terms of what actually happened after the fall, Ms.
16 Rose was offered medical assistance ADESA on site.  She
17 declined and preferred to take herself to her own hospital.  So
18 her daughter, who is here with her today, was there with her
19 that day as well and her daughter drove her to Scottsdale
20 Health Care Shea.
21         So, again, we still have some uncertainty and some
22 unverification about what actually happened in the fall and in
23 the incident. What is believed to be undisputed is that that
24 afternoon she was seen in the ER at Scottsdale Health Care
25 Shea, and a fracture of her right humerus, this bone here, was

1  diagnosed.  There was no dislocation.  She was put in an
2  immobilizer and a brace and released later that afternoon.  She
3  treated nonsurgically with an orthopedic surgeon for a few
4  months after that.
5        She had some physical therapy between the end of May
6  and September 2010.  September 2010 is the last record of
7  treatment that we actually have on the arm.  And we have -- we
8  have seen an itemization of medical expenses of about $17,000.
9        The medical records that we reviewed note that the
10 fracture properly healed and the doctor noted a nearly full
11 range of motion.  We have not seen any record or any opinion
12 that confirms any permanent impairment.
13       So we have been given some medical records but not all
14 of them.  I brought a set of medical record releases for Ms.
15 Rose to sign today, which she's been in the process of doing.
16 I'd like to get those back today so we can keep the process
17 moving.
18       So in terms of what we still need to do, we still are
19 trying to identify any witnesses to the actual incident, talk
20 to them about their memories, need to get a little more detail
21 from Ms. Rose about her memory.  We have some written document
22 requests that are ready to go out to her.  We would anticipate
23 taking a few depositions in the case:  Ms. Rose, her daughter,
24 any other eye witnesses that are identified, probably a couple
25 of treating physicians, and we probably need to evaluate her

1  current condition as well with the arm.

2         There's also, not completely unrelated but slightly
3  unrelated to Ms. Rose, a possible indemnification issue we need
4  to analyze and potentially explore as well with respect to the
5  company that she was representing there that day.

6         THE COURT: All right. So as it stands now, the
7  witnesses that you have identified, I understand you will take
8  Ms. Rose's deposition, but can you state a number of the
9  anticipated depositions that you would expect to take? At this
10 juncture, of course, I understand that could change through
11 investigation.

12        MS. MacHENRY: Right. I understand that Denise, Ms.
13 Rose's daughter, was there with her on the day of the incident
14 as well. It is not clear on whether she actually saw the fall.
15 But since she was there that day that certainly is an
16 additional deposition we would anticipate taking.

17        Ms. Rose's treating orthopedic surgeon, Dr. Frank
18 Musa, is certainly one we would anticipate deposing, possibly a
19 physical therapist, and maybe another orthopedic. And then as
20 I said, there may be other people that we learn may have
21 witnessed it. There may be other eye witnesses we don't know
22 about yet. Any other eye witnesses that are identified, those
23 would be very key depositions as well.

24        THE COURT: Any 12(b)(6) motions you anticipate
25 filing?

1    MS. MacHENRY: There will likely be a Motion for
2 Summary Judgment down the road. I don't anticipate at this
3 point any 12(b)(6) Motions to Dismiss.
4    THE COURT: All right. Thank you.
5    Ms. Rose, if you would, if there's anything that you
6 wish to say on your own behalf with respect to what you
7 anticipate. In essence, what I'm trying to get at is what you
8 anticipate the case to be about, and that will give the Court a
9 better idea of what how to set the schedule here in moving
10 forward.
11    So you may proceed.
12    MS. ROSE: It was on April 7th at ADESA Auto Auction.
13 We had gone out there, three of us, my daughter, myself, and
14 one of her business partners. And they had gone to the general
15 -- this auction had been set up different by GM than ever
16 before, in all the years I have gone out there. Normally, a GM
17 Auction department would have, because it's a kind of like a
18 private sale, the regular dealers can't go to it, and they
19 usually have it in like two lanes. Either -- it used to be
20 like Lane 1 and 2. It's hard to explain.
21    THE COURT: Can I -- and I don't mean to interrupt
22 you, but because you are a pro se -- you are representing
23 yourself, and we call those that represent themselves in an
24 action to be pro se litigants.
25    Normally, a person would have a lawyer, and that

1  lawyer would speak on behalf of that person.  What's different
2  when you represent yourself is you are making statements on
3  behalf of yourself.  And therefore, I have to tell you that any
4  statements you make here could be statements that you are bound
5  by.
6          And that shouldn't be scary, because you always
7  presume people will say the same thing any time they are
8  discussing the same matter.  But it's a caution, because
9  everything you do say here you -- certainly there will be a
10 record of it.
11         And also, what I'm getting at is not really asking you
12 to go over the facts of your case but just to give me an idea
13 how complicated it will be, how many witnesses that you will
14 need to call.  So you don't really need to tell me exactly what
15 happened.
16         MS. ROSE:  Okay.
17         THE COURT:  If you want to, that's fine.  But it
18 really isn't relevant for my purposes here today.
19         Do you understand that?
20         MS. ROSE:  Yeah.  After -- I didn't exactly know how
21 badly I was hurt until some man picked me up off the ground and
22 I was bleeding and I didn't have any feeling in my right arm.
23 And I asked if they were going to call an ambulance, because it
24 had apparently had -- I had been knocked out powerfully or
25 something.  And they said no, just go -- this Darryl and Jerry

September 12, 2012 - Scheduling Conference

1  Styler (phonetic), said no, just get my daughter to bring the
2  car around and they would put me in the car and she could take
3  me to an emergency room, which she did.
4         I have no feeling in my arm.
5         MS. DENISE ROSE:  Answer the question.  She's asking
6  you about witnesses.
7         THE COURT:  And your name, ma'am?
8         MS. DENISE ROSE:  Denise Rose.
9         THE COURT:  Denise Rose.  You are her daughter?  Good
10 morning to you as well.
11        Since you aren't her lawyer or the party, you are not
12 allowed to speak.  You can certainly talk to her privately but
13 you are talking loud enough that I can hear you.  So if you do
14 want to talk privately for a minute away from the microphones,
15 please go ahead.
16        But anyway, maybe it would be helpful if I asked you
17 questions.  How many witnesses do you anticipate if this matter
18 goes to trial that you would be -- you might be calling as
19 witnesses on your behalf?
20        MS. ROSE:  My daughter, Denise.
21        MS. DENISE ROSE:  She just asked you how many.
22        MS. ROSE:  Three.
23        THE COURT:  Three.  And do you anticipate there will
24 be any need for a complicated discovery, in other words,
25 documents that you will be asking to be produced?  Anything of

1  that nature?
2           MS. ROSE:  No.
3           THE COURT:  All right.
4           MS. ROSE:  I've got some pictures.
5           THE COURT:  Well, what I would suggest you do is even
6  though you are representing yourself, you are expected to
7  understand the basic Rules of Criminal (sic) Procedure and the
8  Local Rules, and I would consult with those because there are
9  certain discovery obligations you will have, things you will
10 have to produce just as the defendants have those discovery
11 obligations.  And it might be these ladies here would be
12 helpful in identifying the categories of the kinds of things
13 that you will need to produce.  So you might talk to them about
14 those photographs.
15          MS. ROSE:  Okay.
16          THE COURT:  All right.  Well, I think what I'm going
17 to do, and you may be seated, Ms. Rose.
18          I'm going to go over my case management order.  And
19 these are the deadlines that the Court will be imposing that
20 you will need to comply with.
21          The initial disclosure, the deadline, apparently, the
22 initial disclosure has already taken place.  I am going to set
23 a deadline for joining parties and amending pleadings for 30
24 days from the date of this order.  So Ms. Rose, if you do feel
25 the need to amend your complaint, you would have to do that

September 12, 2012 - Scheduling Conference

1   within 30 days of this order or file a motion for leave to
2   amend your complaint.
3           The parties have proposed, and the Court agrees, that
4   depositions in the case will be limited to seven hours as
5   provided by the Federal Rules of Civil Procedure and
6   depositions and interrogatories will be limited by the -- as
7   set forth in the Rules of Civil Procedure and Local Rules.
8           The deadline for completion of fact discovery will be
9   August 30th, -- well, given the limited factual nature of this
10  case as it has been presented to the Court so far, that seems
11  to be unnecessary, unnecessarily far in the future.
12          Ms. MacHenry.
13          MS. MacHENRY:  Of course, we're at the Court's
14  discretion and pleasure about that deadline.  The reason why we
15  did ask for the time that we did, my partner, who formerly was
16  handling the case departed our firm in the summertime.  I have
17  recently taken it over.  So the August 30th date is about 11
18  and-a-half months from now, I guess.  And we're thinking that
19  with the number of witnesses anticipated, should the case not
20  settle, and we do intend to definitely take -- make an early
21  attempt at a settlement resolution as well.  But should that be
22  unsuccessful, there are a number of depositions we can already
23  anticipate.
24          It may possibly take a little bit longer to work
25  things through the process given that Ms. Rose is

UNITED STATES DISTRICT COURT

———— September 12, 2012 - Scheduling Conference ————

1   unrepresented.  So that is just the reason we asked for the
2   time we have.  But we're at the Court's pleasure.
3                THE COURT:  All right.  Well, I am inclined to set it,
4   the deadline for completion of fact discovery, in the spring
5   rather than at the end of the summer.  As always -- and, of
6   course, if the parties have acted diligently and need more time
7   certainly the Court will entertain a request to continue that
8   deadline.  But I am going to set the deadline for completing
9   fact discovery in May, to May 17th, 2013.
10               And this case management order will be filed and so
11  you will have these deadlines on the docket.
12               The deadline for disclosure of experts and completion
13  of expert disclosure, we'll move those dates up as well to -- I
14  will move those three dates, March 8th, 2013 up three months,
15  December 7, 2012; the defendant's expert disclosure will then
16  be due January 25th, 2013; and the depositions April 26, 2013.
17               The parties, if you are not aware, what the local
18  rules require if there is a discovery dispute, in other words,
19  if the two parties are disagreeing about what needs to be
20  disclosed to the other side, the rules require that you confer,
21  try to resolve it amongst yourselves, and if you can't resolve
22  it, call the Court.  I will schedule a telephone conference and
23  we'll discuss it, try to get it resolved that way.  And then if
24  it can't get resolved that way the parties would need to file
25  written motions.

1     The deadline for filing dispositive motions will then
2 be June 28, 2013.  That seems to be sufficient time past the
3 fact disclosure.
4     Also, the deadline for engaging in good faith
5 settlement talks will be July 12, 2013.  It is always helpful
6 early on in the litigation to try to settle a matter, and it
7 sounds like, Ms. MacHenry, you and Ms. Rose may benefit from
8 talking about that now.  If you feel you need the assistance of
9 a mediator, the magistrate judges here in this courthouse do
10 conduct settlement conferences.
11     So if you do feel that you need the assistance of a
12 mediator, you think there's a reasonable likelihood of
13 settlement that would be productive, all you need to do is
14 contact my chambers.  Let my assistant know that you have
15 talked.  Either of you could call and relay that communication
16 that you have talked and feel that that would be appropriate,
17 and the matter will be referred randomly to another magistrate
18 judge in this courthouse.
19     Keep in mind, though, that some of the magistrate
20 judges' calendars are very busy and it may be two or three
21 months out before it gets scheduled.  I found that can be very
22 valuable in cases like this that tend to be of a smaller
23 nature.  But in any event, feel free to avail yourselves of
24 that option as well.
25     Ms. MacHenry.

September 12, 2012 - Scheduling Conference

1    MS. MacHENRY: I have found that to be very helpful as
2 well, Your Honor. And looking ahead, I believe we likely will
3 be requesting that at some point.
4    THE COURT: All right. Well, have you had enough
5 conversation with Ms. Rose at this point to be able to
6 represent her point of view?
7    MS. MacHENRY: I don't think we're quite there yet. I
8 think we need a little bit more development of some facts and
9 some written documents, but I think it's fair to say that
10 that's what we're aiming towards at some point.
11    May I also clarify the date, Your Honor, the April
12 26th deadline? Is that completion of all depositions or expert
13 depositions?
14    THE COURT: Expert depositions.
15    MS. MacHENRY: Thank you.
16    THE COURT: And it might be helpful after this hearing
17 today to just sit down together and talk a little bit. You
18 might be able to resolve a lot just in these few minutes you
19 might have together.
20    MS. MacHENRY: Yes. We have already talked about
21 doing that and plan to do that right after the hearing.
22    THE COURT: All right. Anything further, Ms. Rose?
23    MS. ROSE: No.
24    THE COURT: We are concluded. Thank you very much for
25 coming down here.

September 12, 2012 - Scheduling Conference

1    MS. MacHENRY:  Thank you, Your Honor.
2    THE COURT:  You're welcome.
3    (Proceeding concluded at 9:55 a.m.)

UNITED STATES DISTRICT COURT

```
 1
 2
 3
 4                    C E R T I F I C A T E
 5
 6        I, LAURIE A. ADAMS, court-approved transcriber,
 7  certify that the foregoing is a correct transcript from the
 8  official sound recording of the proceedings in the
 9  above-entitled matter.
10
11        DATED at Phoenix, Arizona, this 25th day of October,
12  2012.
13
14
15                                s/Laurie A. Adams
                                  _____
16                                Laurie A. Adams
17
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT